U.S. EX REL. TORRES v.
SOS INTERNATIONAL, LTD

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA
*EX REL.* CLAUDIA TORRES
PLAINTIFF
v.
SOS INTERNATIONAL, LTD

CASE NO. 1:13-cv-1043

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## I.   INTRODUCTION

(1) This action is to recover damages and civil penalties on behalf of the United States of America arising from the false statements and claims made and presented by the Defendant and/or its agents, employees and co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended ("the Act").

(2) SOS International, LTD ("SOSI" or "Defendant") contracted with the Government to provide language related services for several federal government agencies, including Immigration and Customs Enforcement ("ICE"), an agency of the Department of Homeland Security ("DHS"), and the Federal Bureau of Investigation ("FBI"), an agency of the Department of Justice ("DOJ"). Defendant misused this contract. It created false records pertaining to what and how long its employees worked on projects. It presented these false statements to the Government to receive excessive money from the Government. It then misused the undue reimbursement of federal funds to finance its own agenda.

1

(3) SOSI violated the Act by submitting false claims regarding contractors' hours worked and the allocation of Government funds, which it knew were false, exaggerated and/or ineligible. Defendant also failed to notify appropriate Government personnel regarding the contract's substantially differing performing price and stated ceiling price, in violation of its duty to do so.

## II.    PARTIES

(4) Plaintiff and Relator, Claudia Torres ("Plaintiff" or "Realtor"), is a resident of Leesburg, Virginia, and a former consultant of SOSI, in Reston Virginia. Ms. Torres brings this action for violations of 31 U.S.C. §§ 3729 *et seq.*, on behalf of herself and the United States Government pursuant to 31 U.S.C. § 3730(b)(1). Ms. Torres has personal knowledge of the false records, statements and claims presented to the Government by and for the Defendant, and of Defendant's fraudulent cost reporting practices.

(5) Defendant, SOSI, is a privately held New York corporation that provides information engagement, intelligence solutions, and stability operations support to the United States Government and private sector clients, operating worldwide. Defendant has headquarters in New York, and has locations in two other states including Reston, Virginia and in four foreign countries. It was formed in 1989, and its principal place of business is in New York, NY.

## III.    JURISDICTION AND VENUE

(6) This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3729 and 3730, which specially confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

(7) This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial

district in which defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3729 occurred." Section 3732(a) also authorizes nationwide service of process. Defendant, during the relevant period transacted business in Reston, Virginia, which is located within the jurisdictional district for the Eastern District of Virginia, Alexandria Division.

(8) Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in the jurisdictional district for the Eastern District of Virginia, Alexandria Division, and because some of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

## IV.   GENERAL ALLEGATIONS

### *SOSI's Contractual Relationship with the Government*

(9) The General Services Administration ("GSA") is a Government agency, which operates a federal purchasing program known as the Schedule Contract. This program allows companies to sell to the federal government through a more simplified procurement process and enables federal customers wishing to purchase goods and services to make these purchases more efficiently. Under this program, GSA establishes long term government contracts with vendors (commercial companies) to provide access for government agencies to goods and services at discounted rates.

(10) Pursuant to GSA guidelines, Defendant entered into a contractual relationship with ICE. Defendant contracted to provide foreign language related services including monitoring, interpretation, transcription, translation, and quality control services to ICE from September 10, 2007 until September 9, 2012. ICE contracted to allocate, but did not guarantee, an estimated

3

$50,000,000.00 ($50 million) to the project over the five year period. Under this contract, Defendant bid on and won many Work Request Authorizations ("WRAs"), in which it contracted with ICE to perform specified translation/transcription work. These WRAs specified the contract number, the period of performance, the scope of the work to be performed, the method of submitting invoices and receiving reimbursements, and the maximum dollar amount allocated to the project.

(11) ICE solicited Defendant's foreign language services to further its missions of border protection, immigration enforcement and anti-terrorism efforts. The work SOSI performed mainly consisted of the transcription/translation of wiretaps concerning criminal matters such as the smuggling of people and drugs, false identification, and also police interrogations.

(12) Defendant's Reston Transcription Center was tasked with performing the ICE contract. Defendant provided all management, supervision, and personnel to perform these services.

(13) As the contractor, Defendant was responsible for the acts, or omissions of its agents and employees, and of subcontractors and their employees on this contract. The acts of Defendant described herein were undertaken by its agents and/or employees as set forth below.

### The Process for Receiving Payment from ICE

(14) Payment for the services which the Defendant provided was made by ICE based on cost reimbursement calculations that the Defendant provided in cost reports to the Contracting Officer's Technical Representatives ("COTR") and the Contracting Officers ("CO"), whom the Government retained to act as its program financial intermediaries ("FIs"). FIs used the Defendant's cost reports as the basis upon which to pay the Defendant.

4

(15) The guidelines of the cost reports were prescribed by ICE and detailed regulations, procedures, and instructions were to be followed in calculating and submitting reimbursement claims. Defendant was required to familiarize itself with all applicable regulations, procedures, and instructions and to certify that each filed cost report and any supporting documentation was true, correct, complete, and prepared from Defendant's books and records in accordance with applicable instructions, except when otherwise noted. Federal regulation also required Defendant to furnish the FIs with all information necessary to assure proper payment under the contract. Concealment of, or silence regarding, material facts affecting a Defendant's right to any reimbursement claimed was not permissible.

(16) More specifically, BPA HSCEOP-07-A-00035 required the Defendant to produce and deliver monthly invoices to ICE. ICE, in turn, reimbursed Defendant based on these invoices. To substantiate the invoices, ICE also required Defendant to produce and deliver administrative reports appropriate for monitoring performance of the work.  The reports included monthly administrative reports, weekly status reports, and ad hoc reports if requested.

(17) The monthly administrative reports were to include, among other things, financial statements, personnel status, and work performed under Contract Line Item Numbers ("CLINs"), and the amount billed per CLIN.

(18) Weekly status reports provided information on all employees working on any WRA. Status reports were provided to the ICE Office of Investigation's COTR(s) and Program Manager(s) by the close of business on Wednesday of each week.

(19) Defendant created an internal system that allowed it to create and present statements and reports to the FIs to satisfy these mandates.

5

(20) Defendant also used the Deltek Time and Expense ("Deltek") program. Defendant used Deltek to record how much time its personnel spent on a specific WRA project. Defendant assigned each WRA a specific charge code in Deltek.  Personnel were told to input hours and corresponding WRA charge codes into Deltek themselves.

(21) Defendant also used daily log-in sheets to record personnel's daily hours. Hours recorded in log-in sheets were to match the Deltek reports, which were both supposed to be charged to the correct WRA account.

(22) The program assistant approved the timesheets. Once approved, log-in sheets and Deltek reports were then scanned and put into a folder that contained all ICE project paperwork. These log-in sheets and Deltek reports, along with "corresponding" expense reports (which included, among other things, documents reporting the CLIN code under which personnel worked and vouchers reporting rates paid to said personnel), were then submitted to the Deputy Program Manager (DPM) every four weeks. The DPM, after verifying all information, submitted these documents to ICE FIs for reimbursement.

(23) When submitting these reports, Defendant certified that all the information was true and accurate, and done according to the guidelines outlined in the contract. Defendant certified that the submitted labor hours were performed on the contract; the labor met the labor qualifications specified in the contract; the employees performing the contract met the qualifications outlined in the contract; and the hourly wages accurately depicted the wages, costs, expenses, and profits paid by the Defendant.

(24) Defendant was required to disclose to ICE or its FIs the discovery of any material error or omissions in claims submitted for reimbursement to ICE. Defendant was not free to silently accept windfalls from such errors, or to take steps to conceal errors.

(25) ICE promptly and routinely paid Defendant for all, or nearly all, claimed amounts, relying on Defendant's reports.

*Defendant's Fraudulent Practices and Statements*

(26) In April 2008, Defendant hired Plaintiff as a consultant to transcribe and translate foreign languages for several different programs and contracts, including the ICE contract.

(27) In the Spring of 2009, Maximo Omar Duluc ("Duluc") was introduced as the new DPM. As DPM, Duluc was responsible for approving timesheet information entered by his subordinates. Duluc then submitted approved information and supported documentation to the Government's FIs. As Defendant's employee, Duluc's submissions were accepted by the FIs and, in turn, Defendant was paid based on these submissions.

(28) In July 2009, Plaintiff became the new Transcription Center Manager. She became responsible for among other things, managing other consulting linguists working on WRAs. As the Transcription Center Manager, Plaintiff was privy to which WRAs the personnel worked under, the log-in sheets, the transcripts the linguists created, and some of the reports submitted to the Government.

(29) Duluc was Plaintiff's direct supervisor, although she reported to Program Manager Martin Valencia ("Valencia") as well. Valencia managed contracts with other government organizations such as the Drug Enforcement Agency. Both Duluc and Valencia instructed Plaintiff about cost reporting procedures. Plaintiff additionally worked and communicated with other personnel who participated in the cost reporting process, including Brittany Pacifico (who took over the deputy program manager position in October 2012) and Pilar Lizarazo (the Program Assistant). In 2012, Claudia Thornton, who was Program Director and later the

Program Manager of the Language Services Group, also gave orders to Plaintiff concerning ICE projects.

(30) In October 2012, Defendant's employee, Valencia, instructed Duluc to take leave and to not return to work based on suspicions that he had aided other SOSI personnel in misappropriating funds.

(31) Upon Duluc's departure, Plaintiff was asked to take on many of Duluc's responsibilities. She was asked to process task orders and consultant agreements, work with remote linguists, process old invoices, create hour case breakdowns, and other duties. As a result, Plaintiff began to notice and be told about many inconsistencies and discrepancies in the statements and reports submitted to ICE for reimbursement.

(32) To address the suspicion of misappropriation of funds by Duluc, Defendant through its employee Valencia, asked Plaintiff, in October 2012, to compare ICE WRAs with transcripts submitted to ICE. Plaintiff looked at awarded WRAs, transcripts that indicated the personnel who worked on said WRA, where the work was reportedly worked on (at Reston Transcription Center or remotely), who received payments under these WRAs, how much the personnel received for alleged work, and how many hours it allegedly took personnel to complete project. After viewing and comparing these documents, Plaintiff reported to Defendant that there were many discrepancies.

(33) For example, the hours supposedly billed by Gleny Fernandez (Duluc's wife) and Jonathan Bautista's (Duluc's close friend) did not add up. Both employees were being paid large amounts of money through flat rate fees for work actually done by other personnel. In Gleny Fernandez's case, she billed 2233 hours in Deltek (an anomaly compared to how many hours an average person would work within a 6 month period) and was also paid for flat rate projects from

March to July. The flat rate reimbursements totaled $72,300 for the four months. The discrepancies for these two consultants appeared from December 20, 2010 until at least July 29, 2012.

(34) The following WRAs: WRA_12_001, WRA_12_003, WRA_12_008, WRA_12_009, WRA_12_121 were among the many falsified claims sent to ICE for reimbursement. Both Gleny Fernandez and Jonathan Bautista received payment based on the information submitted, even though they had not worked on these projects.

(35) After the internal investigation confirmed the misappropriation, Defendant alerted the contracting authority as well as the Virginia state criminal authorities. Duluc and several other employees of Defendant's were arrested by Fairfax County Police on January 4, 2013. Duluc was charged with embezzlement. Duluc's wife, Gleny Fernandez was charged with receipt of stolen goods. The preliminary hearings for Duluc and Fernandez have been continued multiple times, and are currently set for August 21, 2013.

(36) After discovering Duluc's embezzlement, although Defendant agreed to repay the Government the money that Duluc had siphoned off, the CO instructed the Defendant not to pay the money back but rather to under-bill ICE for future work. Thus, in December 2012, Defendant sent ICE an invoice for zero dollars for the work it did on WRA_0007_13_HSIT3, although linguist personnel Roberto Arias, Heidi Nunez, and Fernando Mateo performed work under that project.

(37) However, Defendant did not disclose the true scope or nature of the misappropriation to ICE. Defendant failed to disclose to ICE that in addition to fraudulently siphoning monies to his wife and others, Duluc had also been falsifying Defendant's records and reports and submitting false claims to ICE for years.

9

(38) On February 24, 2013, Plaintiff resigned from SOSI.

(39)  Based on the information Plaintiff came to know, Plaintiff alleges that Defendant has systematically defrauded the United States for at least 3 years prior to the filing of this action by: (1) manipulating internal information and reports and (2) submitting invoices to ICE that it knew were greatly exaggerated and/or contained items that were not properly reimbursable at all.

(40) The following examples are illustrative of the types of false claims Defendant has made in its filed cost reports, but do not include each and every false claim made by the Defendant. In each instance, consistent discrepancies between reported internal information and submitted invoices, and internal correspondences reveal the Defendants' knowledge of the false and fraudulent nature of its claims for reimbursement. On the basis of personally reviewing numerous internal timesheets, WRAs, and submitted transcripts, Plaintiff alleges that the following practices were widespread in Defendant's cost reporting to ICE.

## COUNT I
### Overbilling: Billing ICE for More Time then was actually Spent Doing Work
[31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), (a)(1)(G)]

(41) Plaintiff realleges and incorporates by reference the allegations made in Paragraphs 1 through 40 of this Complaint.

(42) Under each WRA, Defendant was allotted a specified number of hours to complete detailed projects. Defendant was obligated to notify ICE, if, at any time during performing the contract, it had a reason to believe the total number of billable hours would be substantially less than the stated ceiling hours. And, ICE was only obligated to compensate Defendant for the time its personnel actually spent working on specified WRA projects. These payments were based on claims filed by Defendant.

(43) Notwithstanding this rule, Defendant created and submitted falsified statements claiming that it used all WRA hours to complete projects, even though it actually had used less, thereby knowingly obtaining compensation to which it was not entitled. Defendant submitted these falsified timesheets to the FIs, who, in turn, compensated it based on the submitted forms.

(44) Each WRA project had a corresponding charge code number. These numbers were set up in Deltek so that personnel could accurately track what they were working on and how much time they spent working on specific projects.

(45) Based on Plaintiff's firsthand knowledge, sometime between 2010 and 2011, Duluc, began falsifying personnel timesheets by instructing the linguist personnel not to specify on the log-in sheets on which WRA they had worked, by inaccurately reporting the WRA that was being worked on in the Deltek program, and falsely reporting that all awarded WRA hours had been used by Defendant's personnel.

(46) Specifically, Duluc instructed the linguist personnel to record their time onto one log-in sheet which failed to specify which WRA project was being worked on even though multiple WRAs were worked on at the same time. Duluc also instructed personnel working on WRA projects to stop inputting information into the Deltek program themselves. Instead, another employee would enter this information on the personnel's behalf into the Deltek program. Pilar Lizarazo, the program assistant, regularly entered this information into Deltek for the linguist personnel. This practice continued until January 2013.

(47) In November 2012, after the discovery that Duluc had aided other SOSI personnel in the misappropriation of funds, Defendant begun an in-house investigation. The investigation confirmed that the daily time logs did not match the information on WRA transcripts sent to ICE.

11

(48) In January 2013, a SOSI manager brought in to provide oversight to the language group admitted to Plaintiff that hours had not been properly reported and billed, and acknowledged that the log-in sheets did not match the Deltek records or the names of the linguists on the transcripts submitted to ICE.

(49) By willfully and knowingly submitting falsified statements claiming compensation for time it did not actually work, and knowing that these claims would have been disallowed had the FIs known of the falsity of the statements, Defendant violated 31 U.S.C. 3729, by making false claims leading to U.S. Government overpayment. Each and every compensated WRA based on false claims is a separate false claim and is subject to the penalty clause of 31 U.S.C. 3729. The U.S. Government has suffered damages in the amount of the total of the WRA amounts claimed on the filed cost reports, which are significantly greater than the actual amount of time worked by Defendant. This amount easily exceeds $5,000,000.

### COUNT II
### Cross-Agency Billing: Billing ICE for Work done for Other Projects
[31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), (a)(1)(G)]

(50) Plaintiff realleges and incorporates by reference the allegations made in Paragraphs 1 through 49 of this Complaint.

(51) In addition to the contract with ICE, Defendant also signed BPAs with other government agencies. Transcription Center work mainly consisted of ICE projects (about 90%). The other 10% of the workload dealt with other agencies such as the Drug Enforcement Administration, Bureau of Alcohol, Tobacco, Firearms, & Explosives, the Food & Drug Administration, etc. Plaintiff did and managed work under these BPAs as well.

12

(52) Each individual BPA was allocated a specified number of billable hours and funding through various WRAs. Under the BPAs with ICE, the billable hours and funding were to be used <u>only</u> for ICE's language related services.

(53) Despite this established principle, Defendant created and submitted falsified statements billing ICE for work performed under other agencies' BPAs, thereby knowingly obtaining compensation to which it was not entitled. Defendant submitted these falsified records to the FIs, who, in turn, compensated Defendant based on these false submissions.

(54) Furthering its scheme to overbill ICE, Defendant regularly instructed its personnel to work on other agencies' projects using ICE time and money. By falsifying the personnel timesheets, Defendant systematically defrauded ICE by billing many non-ICE projects to ICE.

(55) Since personnel were not indicating the specific WRAs on which they worked on their timesheet, and were not recording time into Deltek themselves, Defendant was able to create false records and reports about which projects its personnel were working on.

(56) On many occasions, Defendant through its employees, including Duluc and Valencia, instructed Plaintiff and other linguist personnel to utilize ICE BPA hours to work on other agencies' BPA projects when these agencies no longer had available hours and thus had no more funding.

(57) More specifically, Defendant through its employee Valencia instructed Plaintiff to bill ICE for FBI translation projects after FBI funds ran out. Plaintiff began working on the FBI project on October 22, 2012. On November 1, 2012, FBI funding ran out. However, Plaintiff was instructed to bill 51.5 hours worked on the FBI project to ICE BPA hours. Plaintiff was later paid for those hours worked.

(58) Based on Plaintiff's firsthand knowledge, Defendant fraudulently billed ICE under at least the following WRAs: 4008-169, 4008-172, 4008-173, 4008-176, 4008-166, 4008-167, 4009-013, for work that its personnel performed on other agencies' projects.

(59) Additionally, in October 2012, Defendant' employee, Valencia, instructed Plaintiff to have linguist personnel utilize "old" ICE BPA hours before the end of the fiscal year for time actually worked on other agencies' work. Defendant then presented claims based on these falsified records to ICE for compensation.

(60) ICE reimbursed Defendant based on these statements, not knowing it was being billed for other agencies' work.

(61) By willfully and knowingly submitting falsified statements claiming compensation for work done on other projects not authorized by the ICE contract, and knowing that these claims would have been disallowed had the FIs known the falsity of the statements, Defendant violated 31 U.S.C. 3729, by making false claims leading to U.S. Government overpayment. Each and every compensated WRA based on false claims is a separate false claim and is subject to the penalty clause of 31 U.S.C. 3729. The U.S. Government has suffered damages in the amount of the total of the WRA amounts claimed on the filed cost reports, which are significantly greater than the actual amount of time worked by Defendant. This amount easily exceeds $3,000,000.

## COUNT III
### Non-billable Items: Billing ICE for Items not Permitted by the Contract
[31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), (a)(1)(G)]

(62) Plaintiff realleges and incorporates by reference the allegations made in Paragraphs 1 through 61 of this Complaint.

14

(63) Each WRA was allotted a specific amount of funds to cover specified projects. Each project was identified by a specified CLIN code. The funds allotted under an awarded WRA, could <u>only</u> be used for an identified CLIN.

(64) The following were the exclusive CLIN codes Defendant agreed to provide and bill to ICE:

CLIN 0001 Title III Monitoring, Interpreting & Transcribing;
CLIN 0002 Non-Title III Translation Services (per word);
CLIN 0003 Non-Title III Translation Services (per word w/ formatting);
CLIN 0004 Interpreting Services (Oral);
CLIN 0005 Consultation & Planning Services;
CLIN 0006 Sign Language; and
CLIN 0007 Other Direct Costs (ODCs) which was broken down into Monthly Administrative Reports (0007AA), Weekly Status Reports (0007AB), Ad Hoc Reports (0007AC) and Travel Costs per call (0007AD).

(65) To obtain a reimbursement for these items, Defendant was required to create reports identifying the CLIN under which the work was performed. Defendant then submitted these reports to ICE FIs, who, in turn, would make payments based on these submissions.

(66) As with the billable hours, Defendant had an obligation to notify ICE, if, at any time during the contract, it had reason to believe the total price would be substantially less or more than the stated ceiling price. Upon information and belief, such notification was never submitted to ICE.

(67) Based on Plaintiff's firsthand knowledge, Defendant regularly charged non-billable items to ICE for the purpose of wrongfully obtaining reimbursement. Defendant often falsified reports so that ICE would pay for projects, travel expenses, administrative costs, and other miscellaneous expenses, knowing that these expenses were not covered by a CLIN of the contract.

15

(68) The contract stated that travel costs were not to be billed to ICE unless the travel was approved by the COTR in advance. Nevertheless, Defendant submitted falsified statements to ICE FI's by including unauthorized travel fees in the total travel costs billed to ICE. More specifically, on expense reports sent to ICE, Defendant modified travel costs to include services fees not tied to actual airfare, even though the contract prohibited billing ICE for these fees. These false statements were then submitted to ICE FI's for reimbursement.

(69) Under the CLIN system, administrative costs were not to be billed to ICE. However, for five years, Defendant routinely instructed Plaintiff to bill ICE for administrative work under CLIN codes that did not cover administrative work. Defendant then created expense reports that were substantiated by falsified documents to request reimbursement from ICE for these costs. These reports and documents were then submitted to ICE FI's for reimbursement. More specifically, as a transcription manager, Plaintiff was responsible for administrative duties including setting up assignment sheets for linguists, reviewing expense reports, etc. After completing such assignments, Plaintiff was instructed to bill ICE for this time under WRAs as if it was time spent on transcription or translation, not on administrative duties.

(70) Based on Plaintiff's first-hand knowledge, Defendant also consistently billed ICE for personnel lunch by claiming reimbursement for them under CLINs even though they were not permitted by the contract.

(71) ICE reimbursed Defendant based on the information Defendant submitted to it, unaware that the records supporting the reimbursement were falsified.

(72) By willfully and knowingly submitting falsified statements claiming reimbursement for items not billable under the ICE contract, and knowing that these claims would have been disallowed had the FIs known of the falsity, Defendant violated 31 U.S.C. 3729, by making false

16

claims leading to U.S. Government overpayment. Each and every reimbursed WRA based on false claims is a separate false claim and is subject to the penalty clause of 31 U.S.C. 3729. The U.S. Government has suffered damages in the amount of the total of the WRA amounts claimed on the filed cost reports, which are significantly greater than the actual amount of time worked by Defendant. This amount easily exceeds $200,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff/Relator prays for judgment against Defendant as follows:

(1) That Defendant cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

(2) That the Court enter judgment against Defendant in an amount of $8,200,000, or such greater amount as shall be proved at trial for damages the United States has sustained as a result of Defendants' actions, as well as a civil penalty against Defendant of $11,000 for each violation of 31 U.S.C. § 3729;

(3) That Plaintiff/Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal Civil False Claims Act;

(4) That Plaintiff/Relator be awarded all costs and expenses of this action, including attorneys' fees; and

(5) That the United States and Plaintiff/Relator receive all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury.

Respectfully submitted,

Leslie McAdoo Gordon
VA Bar # 41692
McAdoo Gordon & Associates, P.C.
1140 19th Street, N.W., Suite 602
Washington, D.C. 20036
Tel.  (202) 293-0534
Fax. (202) 478-2095
leslie.mcadoo@mcadoolaw.com
*Counsel for Relator Claudia Torres*

18

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a copy of the foregoing Amended Complaint and Demand for Jury Trial was served by electronic mail this 15th day of May, 2014 on:

>Erin K. Murdoch-Park
>Special Assistant U.S. Attorney
>Counsel for the United States
>2100 Jamieson Ave.
>Alexandria, VA 22314
>(703) 299-3911 Telephone
>(703) 299-3983 Facsimile
>Erin.Murdock-Park@usdoj.gov

>Leslie McAdoo Gordon
>McAdoo Gordon & Associates, P.C.
>1140 19th St. NW, Suite 602
>Washington, DC 20036
>VA Bar # 41692
>(202) 293-0534 telephone
>(202) 478-2095 facsimile
>leslie.mcadoo@mcadoolaw.com

19